**RIVEROAKS DEVELOPMENT CORP. et al. v. SHEPPERD, Secretary of State et al.**

**No. 10011.**

Court of Civil Appeals of Texas. Austin.

Jan. 30, 1952.

Rehearing Denied Feb. 20, 1952.

———◆———

Cantey, Hanger, Johnson, Scarborough & Gooch, Whitfield J. Collins, Fort Worth, for appellants.

Price Daniel, Atty. Gen., J. A. Amis, Jr., Asst. Atty. Gen., for appellees.

HUGHES, Justice.

This suit is for the recovery of franchise taxes paid under protest by appellants Riveroaks Development Corporation and Pasadena Gardens Development Corporation.

The Secretary of State, State Treasurer and Attorney General of Texas were sued in their official capacities only and will be herein referred to as the State.

The trial court, acting without the aid of a jury, rendered judgment that appellants take nothing by their suit.

The single question presented by this appeal is whether or not promissory notes executed by appellants and secured by a lien on real estate cease to be "outstanding notes" within the meaning of Article 7084, Vernon's Ann.Civ.St., when appellants have contracted to sell such real estate to a purchaser who assumes the payment of the vendor's lien notes.

The pertinent portion of Article 7084, supra, provides: "* * * every domestic and foreign corporation heretofore or hereafter chartered or authorized to do business in Texas, or doing business in Texas, shall, on or before May first of each year, pay in advance to the Secretary of State a franchise tax for the year following, based upon that proportion of the outstanding capital stock, surplus and un- divided profits, plus the amount of outstanding bonds, notes and debentures (outstanding bonds, notes and debentures shall include all written evidences of indebtedness which bear a maturity date of one (1) year or more from date of issue, and all such instruments which bear a maturity date of less than one (1) year from date of issue which represent indebtedness which has remained continuously outstanding for a period of one (1) year or more from date of inception whether or not said indebtedness has been renewed or extended by the issuance of other evidence of same indebtedness to the same or other parties, * *."

The "contracts of sale and purchase" used by appellants in connection with the sale of the various properties securing the vendor's lien notes, above mentioned, contain the following provisions, relied on by the parties hereto as having a material bearing on the question now before us:

"The Purchaser assumes and agrees to pay as part of the purchase price for the above described real property, the balance, above stated, owing upon a certain note evidencing a Title VI F.H.A., insured loan in favor of the mortgagee above named, secured by a deed of trust executed by Seller, covering the above described real property, of record in the office of the County Clerk of the County in which the above land is situated, to which reference is made for all purposes. Purchaser agrees to pay said note according to its face and tenor, and to comply with the terms, obligations and conditions of said deed of trust and the rules and regulations of mortgagee and Federal Housing Administration, and to pay to Seller the balance of the purchase price above the F.H.A. loan, in monthly installments in the amount above stated, including interest at the rate of 6% computed monthly.

"Purchaser shall pay said total monthly payment above set out to Seller at the office of the Seller in Fort Worth, Texas, * * * and out of said total payment Seller shall pay to the above named mortgagee the payments upon the F.H.A. loan above mentioned, but when Seller shall have been paid the amount due Seller above

the F.H.A. loan, Purchaser shall make payments direct to the insured mortgagee.

"The Purchaser agrees that prior to, or when Seller shall have been paid the balance of the purchase price above the F.H.A. loan * * * that Purchaser will, at the request of the Seller, apply to the above named mortgagee and Federal Housing Administration to be accepted as an insured mortgagor or borrower on the above mentioned F.H.A. loan in place of the Seller * * *.

"Seller agrees, when the full balance of the purchase price, above the F.H.A. loan, together with all interest thereon, has been paid by Purchaser and Purchaser has been accepted in place of the Seller as an insured borrower, to execute and deliver to Purchaser a good and sufficient warranty deed conveying the above described real property to the Purchaser, in which deed the balance then owing upon the above mentioned F.H.A. loan shall be assumed. * * Purchaser agrees to execute, acknowledge and deliver to the above mentioned mortgagee an agreement of assumption and release, wherein Purchaser assumes and agrees to pay the above mentioned F.H.A. insured loan, and Seller is released from any further liability on said loan."

From appellants' brief we copy the following concise statement of the manner in which appellants conducted their business of interest here:

"The procedure followed by both Riveroaks and Pasadena with respect to the notes in question was to borrow money from Gulf Coast Investment Corporation for the construction of certain houses. Individual notes were given to Gulf Coast covering each individual loan and each of the notes was secured by a deed of trust and mortgage on the specific property involved. All of the loans in question were insured by the Federal Housing Administration and the entire procedure was subject to F.H.A. rules and regulations.

"When the houses in question were completed, Riveroaks and Pasadena would sell each house on the condition that the purchasers would assume the note payable to Gulf Coast Investment Corporation with respect to such house. The sale price of each property would exceed the amount of the note due Gulf Coast on such property and instead of issuing a deed to the purchaser, Riveroaks and Pasadena would enter into a 'Contract of Sale and Purchase' under which the purchaser agreed to pay such excess to the seller. The purchaser entered into possession and assumed all the incidents of ownership but agreed to make all payments on the purchase price through Riveroaks or Pasadena until the excess of the purchase price over the F.H.A. loan had been paid off. Thereafter payments were in all cases made by the purchaser direct to Gulf Coast.

"After payment of the excess above the loan it was agreed that the purchaser would apply to Gulf Coast and F.H.A. to be accepted as the insured mortgagee, but during such interim payments on the purchase price were made direct to Gulf Coast and not to Riveroaks or Pasadena. Upon acceptance of the purchaser as mortgagee, Riveroaks and Pasadena, being released of all contingent liability, would formally deed the property to the purchaser.

"During the period prior to the issuance of the actual deed to the purchaser, the property was carried on the tax rolls in the name of the purchaser. The purchasers paid taxes in monthly installments to Riveroaks or Pasadena, who immediately forwarded them to Gulf Coast until the purchaser began to make payments direct to Gulf Coast. In both situations Gulf Coast paid the taxes at the appropriate time in the name of the insured purchasers.

"Insurance policies and premiums thereon were handled in the same way. The purchasers were free to select their own insurers and premiums were paid in monthly installments to Riveroaks or Pasadena to be forwarded to Gulf Coast, or to Gulf Coast direct depending on the situation. Gulf Coast in turn paid the premiums when due. Policies were issued in the name of the purchasers and premium notices were sent to the purchasers in care of Gulf Coast. Proceeds were payable to the purchaser subject to a mortgagee clause in favor of Gulf Coast."

In arguing that notes secured by liens on real estate cease to constitute "outstanding notes" as that term is used in Article 7084, supra, as soon as such notes are assumed by the purchasers of the property securing the notes appellants rely principally, if not wholly, upon an opinion of the Attorney General of Texas, No. V–500, dated February 12, 1948, which in turn was based upon an earlier opinion of the Attorney General dated August 20, 1934.

The two opinions are summarized and explained by the Attorney General in a letter addressed to the Honorable Ben Ramsey, Secretary of State, dated October 7, 1949, from which we quote:

"By letter opinion, dated August 20, 1934, this office advised Hon. W. W. Heath, then Secretary of State, that notes executed by a corporation in payment of land which was subsequently sold to a purchaser who assumed payment of the notes, were no longer taxable capital of the corporation after their assumption by the purchaser of the land securing the notes.

"In opinion No. V–500, dated February 12, 1948, this office held that notes executed by a corporation in payment of money borrowed to erect improvements upon property subsequently sold to purchasers who assumed payment of such notes, do not constitute 'outstanding notes' of such corporation, taxable under the provisions of Article 7084.

"The basis of the above opinions was that after sale of the property securing the indebtedness, and the assumption thereof by the purchaser, the capital represented by the indebtedness was no longer borrowed or invested capital used in the corporate business. True, it had been used in corporate business, but the transaction in which it was used has been completed. The property securing the indebtedness has been sold and the purchaser as part of the purchase price has assumed payment of the indebtedness. The corporation has no further connection with either the property or the indebtedness unless it should happen that the purchaser defaults in payment of

the indebtedness and the holder thereof looks to the corporation to pay the same. As stated in opinion No. V–500, the purchaser after assuming the indebtedness becomes primarily liable therefor and the corporation is liable as surety. Should the purchaser default on the assumption and the property securing the loan could not be sold for enough to pay the indebtedness and the purchaser could not pay any deficiency then the corporation would be forced to pay any balance due on the indebtedness. However, this is such a contingent liability that it is not believed the indebtedness could be called an outstanding indebtedness of the corporation within the meaning of Article 7084."

In his present brief the Attorney General says: "Appellants have pitched their case on the holding in Attorney General's Opinion V–500. This opinion is not applicable to the facts in this case because the opinion deals with an executed contract (deed) rather than with an executory contract such as is involved in this appeal."

We fail to appreciate the distinction made by the Attorney General. What matters it that legal title to real estate passes under a deed and does not under a contract of sale or that a deed may reflect an executed transaction and a contract an executory one when considering the wholly unrelated question of whether certain notes are "outstanding notes" under our franchise tax statutes?

Furthermore, we do not agree that the premise upon which the Attorney General based his early opinion is sound. This premise was that after the sale of the property and assumption of the notes "the capital represented by the indebtedness was no longer borrowed or invested capital used in the corporate business."[1]

A similar argument was rejected in the case of A. B. Frank Co. v. Latham, Sec. of State, 145 Tex. 30, 193 S.W.2d 671, affirming this Court's opinion reported in 1945, 190 S.W.2d at page 739, where the question was whether or not corporate stock redeemed and cancelled by the corporation

1. This would be true even though the purchasers did not assume payment of the notes but merely took the property subject to their payment.

as authorized by its charter was "outstanding capital stock" under Article 7084, as amended in 1930 and 1931.[2]

We quote from the Court of Civil Appeals' opinion: "Thus the language of former acts was changed from 'authorized capital stock' to 'outstanding capital stock' to which was added for tax purposes outstanding bonds, notes and debentures. Appellant urges that by the change from 'authorized' to 'outstanding' capital stock and the inclusion of other items composing the actual capital structure of the corporation, the Legislature evidenced a clear intent to tax only the actual capital structure being used by the corporoation for doing business; and so to remove from the tax base capital stock which had been redeemed from surplus, retired and no longer a part of the corporation's capital structure. It urges that such is the purpose and import of the law; that the stock so redeemed and canceled by it was no longer outstanding and consequently not subject to the tax." 190 S.W.2d 740.

Both this Court and the Supreme Court held that because the corporate stock had not been retired in accordance with our statutes that it was "outstanding stock" within the meaning of our franchise tax statutes even though such stock reposed in its own vaults and no longer constituted a part of the capital structure of the corporation, the Court of Civil Appeals using this language: "Franchise taxes, however, are not taxes upon the assets of a corporation as such. Being creatures of the law, and of their charters issued pursuant to law, they can exercise only such powers as the law permits. The tax so levied is for the privilege of doing business in the state, and the properties enumerated in the statutes constitute the base for computing the value of that privilege. The general trend of legislation on the subject has been to broaden that base; and prior to the 1930 amendment the tax was measured, among other things, by the amount of the capital authorized by the charter, or by the approved amendments thereto, whether all of said stock had been issued and sold to subscribers or not." 190 S.W.2d 740.

■ A franchise tax is a charge made by the State against the corporation for the privilege granted it to do business in the State, the amount of the tax being in proportion to the value of the privilege granted, *as determined by the Legislature*. United North & South Development Co. v. Heath, Secretary of State, Tex.Civ.App., 78 S.W.2d 650 (Austin, writ ref.).

■ Our franchise tax statutes were enacted for revenue purposes and should be liberally construed to effectuate that objective. Isbell v. Gulf Union Oil Co., 147 Tex. 6, 209 S.W.2d 762.

In this case we have no question to decide except to determine if the notes in question are "outstanding notes," because the Legislature has used this as part of the criterion to be used in ascertaining the value of the privilege of a corporation to do business in this State. All other law questions discussed by the parties are, in our opinion, immaterial.

■ We encounter no difficulty in reaching the conclusion that the notes in question are "outstanding."

They have not been paid. They have neither been discharged nor released. They are still in existence and constitute a liability of the corporations which is not nearly as remote as represented, which fact can be attested by many whose memory reaches back to the days of the last great economic depression.

The word "outstanding" has been defined by Webster's New International Dictionary, Second Edition, as "undischarged; uncollected or unpaid; unsettled; undetermined." See also similar definitions in 2 Bouv. Law Dict. Rawles Third Division, p. 2434.

We refrain from citing additional authorities to the same effect because the parties do not refer us to any authority which otherwise defines the word "outstanding."

The judgment of the trial court should be, and is, affirmed.

Affirmed.

2. 1930, 5th C.S., 41st Leg., Ch. 68, p. 220, 1931 Reg.Sess. 42nd Leg., ch. 265, p. 441.